(C. D. 1774)

INDUSTRIAL RAW MATERIALS CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 19, 1956)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for the plaintiff.

*George S. Leonard*, Acting Assistant Attorney General (*Joseph E. Weil*, trial attorney), for the defendant.

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* and *James F. Donnelly* of counsel) as *amicus curiae*.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: Certain material, invoiced as "Micro Crystalline Wax Compound No. 6582," was classified by the collector as "synthetic resin" under paragraph 11 of the Tariff Act of 1930 and assessed with duty at 4 cents per pound, plus 30 per centum ad valorem.

The principal claim of the plaintiff is that the involved merchandise is properly classifiable as a mineral wax, and, as such, should be held free of duty under paragraph 1796 of the Tariff Act of 1930. Plaintiff also makes the following alternative claims under said act: That the material involved (1) is properly free of duty under paragraph 1733 as a paraffin, but taxable under section 3422 of the Internal Revenue Code, as amended; (2) is dutiable at 20 per centum ad valorem under paragraph 1536 as a manufacture of wax; (3) is dutiable at 25 per centum ad valorem under paragraph 5 as a mixture of chemical compounds; (4) is dutiable under paragraph 1558 at the rate of 20 per centum ad valorem as a nonenumerated manufactured article.

The principal issue before us, however, is whether the involved material is a wax product, as contended by the plaintiff, or a synthetic resin, as classified.

At the outset of the trial, the following stipulation was dictated into the record:

MR. PICKRELL: It has been stipulated with counsel for the Government, that the imported merchandise which is the subject of this protest, is a mixture composed of approximately fifty percent polyethylene and approximately fifty percent petroleum wax.

MR. WEIL: So stipulated.

MR. PICKRELL: It is further stipulated that the imported merchandise was mixed or blended by heating and agitating after importation in the plant of the plaintiff herein at Lyndhurst, New Jersey, with microcrystalline petroleum wax in the proportion of approximately six parts of the said importation and approximately 94 parts of microcrystalline petroleum wax, that this mix or blend was mixed or blended by heating and agitating in the plant of the plaintiff herein with paraffin wax in the proportions of approximately fifty parts of this mixture or blend and approximately fifty parts of paraffin wax, and that a use of the last mix or blend is for coating sulphite paper for wrapping bread.

MR. WEIL: The Government so stipulates. (R. 3–4.)

During the course of the trial, a large number of exhibits were introduced in evidence. Plaintiff's collective exhibit 1 consists of a sample, admittedly taken from the importation now under consideration; illustrative exhibit 2 is a piece of printed paper, coated with a blend or mixture, described in the stipulation of the parties (R. 8); illustrative exhibit 3 is a sample of paraffin wax (R. 41); illustrative exhibit 4 is microcrystalline wax (R. 43); illustrative exhibit 5 consists of crude beeswax (R. 46); and illustrative exhibit 6 is a sample of polyethylene (R. 47). Defendant's exhibits will be referred to hereinafter as the discussion of the case requires.

Plaintiff's first witness was Cyril S. Kimball, the recipient of a bachelor of science degree from the University of Rhode Island in 1926, with chemistry as his major subject, who, at the time of the trial, was employed as vice president of Foster D. Snell, Inc., consulting chemist and chemical engineer in New York City. He had done "development work on chemical specialities, waxes, polishes, adhesives, coatings, and allied materials" and had had considerable experience in handling and analyzing various types of waxes over a period of years (R. 10–15). On one occasion, at the request of the United States, he had made a special blend of polyethylene and microcrystalline wax (R. 17).

Mr. Kimball testified that he had made analytical tests on a sample of the imported merchandise (plaintiff's collective exhibit 1). From these tests, he reached the following conclusions: The melting point of the sample was between 210° F. and 215° F.; the material in question exhibited crystallinity, but, unlike synthetic resins, was not brittle; the sample was tough, but did not have fracture. While the witness stated that he was unable to make a complete separation of the components in the imported product, he testified that, based upon

the tests made, the imported substance was a wax because "it has crystallinity, it is thermo-plastic and has the appearance and feel of a wax" (R. 25).

Conversely, Mr. Kimball was of the opinion that the imported merchandise is not a synthetic resin, because it has crystallinity, has wax characteristics, and is not amorphous, all of which, he stated, are not characteristics of a resin.

On cross-examination, the witness stated that while polyethylene may be a wax, it is not always a wax; that it is least waxlike as the molecular weight increases; and that it becomes a plastic material, a polymer, and a grease, but that, in his opinion, it never becomes a resin (R. 64). He did not test the imported merchandise for viscosity, nor had he made any tests to determine its elongation, strength, or toughness.

Dr. Charles L. Mantell, called on behalf of the plaintiff, testified that, from 1922 to 1937, he was professor of chemical engineering at the Pratt Institute in Brooklyn and, at the time of trial, held the same position at Newark College of Engineering. He had been engaged continuously as a consulting chemical engineer in the city of New York since 1924. The witness had written extensively for scientific periodicals and was the author of a textbook on electric chemistry as well as one on natural resins.

Dr. Mantell stated that he had had wide experience with waxes, by reason of his employment with wax-producing companies. He testified that, in his opinion, polyethylene was a polymerized material, but not a resin, because—

* * * there is one characteristic of resins in that they are commonly in close relationship in their chemical composition. The polymers of which polyethylene is typical are linear in their composition or structure and therefore are different from the resins.

Plaintiff's witness gave the following summary, relative to tests made on plaintiff's collective exhibit 1:

Chemical tests were run on the solubility of the sample in coal-tar solvents and other solvents in which many of the waxes of the more common type show ready solubility. The sample did not show * * * appreciable solubility in the cold but was readily soluble in hot solutions of benzol and toluol. When the solution was cooled the material was dispersed in a manner similar to that of beeswax and showed better dispersibility than carnauba.

Paraffin, microcrystalline wax, and japan wax showed solubility in these solvents while cold as well as hot. Beeswax and carnauba showed incomplete solubility in the cold, are soluble while hot, and after cooling showed dispersibility. Polyethylene did not show solubility in the cold but did show solubility in the hot.

The sample showed solubility characteristics of the same type as beeswax and carnauba. * * *

Tests were made on paraffin, cereese wax and the sample. The electrical resistance of paraffin wax under these conditions was 800,000 ohms, of micro-

crystalline wax, 800,000 ohms and the electrical resistance of the sample was 810,000 ohms. * * * (R. 100–101.)

The witness further testified that he determined the following melting point ranges:

|  | Melting point |
|---|---|
| Plaintiff's collective exhibit 1 | 190° F.–195° F. |
| Paraffin wax | 130° F. |
| Cereese wax | 145° F.–150° F. |

Further, with respect to the melting point of polyethylene, the witness determined the following:

| Molecular weight | Melting point |
|---|---|
| 4,000 | Approx. 200° F. |
| 7,000 | 208° F. |
| 10,000 to 12,000 | Just above 208° F. |

Plaintiff's witness Mantell substantially agreed with the testimony of the previous witness as to the physical and other characteristics exhibited by the importation at bar. He expressed the opinion that the imported material is a wax (R. 103).

Defendant's first witness was Dr. Warren F. Busse who, at the time he testified, was in the employ of E. I. du Pont & Co. as senior supervisor in the General Research Section "where we do research on all the polymers of the poly-chemical department" (R. 135). He had been in charge of production development work on polyethylene with the same company. He stated that he had received a Ph.D. degree in physical chemistry in 1927 from the University of Wisconsin. He spent about 14 years with B. F. Goodrich Co. "working on natural and synthetic rubber, plastics, polyvinyl chloride." In his research work, he had studied resins of various types, including "natural and synthetic resins associated with the photographic field, the detergent field, synthetic detergents and dye-stuffs" (R. 137).

Dr. Busse testified that he had separated a sample of the imported merchandise (defendant's collective illustrative exhibit B) into its component parts with petroleum ethylene for the purpose of making certain tests to determine the nature of the product. The witness stated that he obtained two fractions (defendant's exhibits C and D) as a result of such separation. He then testified that he endeavored, without success, to press a "film" from the material represented by exhibit D, the wax component of the imported product (R. 148), but was successful, however, in obtaining by a pressing process a film (defendant's exhibit E) from the material, represented by defendant's exhibit C, the polyethylene fraction of the imported product.

From his tests, Dr. Busse determined that the films obtained (defendant's exhibit E) had a tensile strength of 1,400 pounds per square inch and an elongation of 70 per centum in one case and 90 per centum in another (R.158), which the witness stated were properties similar

to those shown by tests on commercial polyethylenes (defendant's exhibit G). By certain measurements, he calculated the molecular weight of defendant's exhibit C to be 15,000 and concluded that the said product was a material comparable in essential properties to the commercial polythenes sold on the market as polythene resins (R. 164–166). In this connection, he testified that polythenes having a molecular weight above five or six thousand are resins (R. 166); the ones under four thousand molecular weight are soft greases, or even liquids or gases; and those around four thousand molecular weight are waxes. The witness further testified that defendant's exhibit C had a viscosity of 1.36 and that he knows of no wax that has a viscosity within that range (R. 177–178). He had tested polyethylenes of a molecular weight within the range 14,000 to 15,000 "which were thermoplastic." He had made a film from such polythenes (R.181), whereas he had tried to make a film from wax, but was unsuccessful.

In the opinion of this witness, the essential property that distinguishes a wax from a resin is the molecular weight, "because along with the molecular weight you get certain properties of elasticity in the melt and the ability to draw out fibers or form films." The imported merchandise represented by defendant's collective illustrative exhibit B, in his opinion, is a resin—a synthetic resin—"It is a mixture of a mineral wax and a synthetic resin but it has the essential properties of a synthetic resin." He stated that "When this material was melted, indicating Exhibit "B", * * * it formed a viscous elastic melt that was very different from the low viscosity melt formed by paraffin wax. The melt from this material could be pulled out in long fibers and threads, a characteristic that is essential to the high molecular weight materials and it is this property of the material that makes it—and that is not possessed by wax—that makes it useful in industrial applications—such as addition to paraffin wax, where it adds properties that you don't get by adding other waxes." (R. 169–170.) The witness stated that when he put a sample of paraffin wax in a test tube, which was placed in boiling water, the wax "melted to a limpid liquid that you could shake very readily and it would splash in the test tube," whereas the imported merchandise (collective illustrative exhibit B) "melted to a rather elastic jelly-like material," which could be drawn out in long fibers (R. 187). The witness, therefore, concluded: "* * * this is the heart of the difference; it is to my mind the basic factor that makes me willing to say that the imported product is a resin" (R. 191).

In connection with the above testimony, the record discloses that no tests were made by this witness to show that defendant's collective illustrative exhibit B, the imported product, in the condition as imported, was susceptible of being made into film, and it appears that the testimony given by the witness Busse, relative to film-forming

characteristics, was directed to such as were found in the polyethylene fraction of the imported product upon separation of the components (R. 197).

The Government's second witness was Doyce Bernard Hanson, an employee of E. I. du Pont & Co., who had received a bachelor of science degree in chemical engineering from the Case Institute of Technology at Cleveland (R. 227–228), and whose employment, at the time of trial, was "concerned with the development of applications for polythene in the trade." He testified that all polyethylenes with which he dealt on his job had a molecular weight ranging from 12,000 to 21,000 and that polyethylenes ranging in such molecular weight are resins (R. 235).

Defendant's witness, James John Chap, who had received a Ph. D. degree in chemistry from Massachusetts State College in 1934, is employed as an organic chemist in the United States Customs Laboratory at New York. He stated that, although he endeavored to do so, he was unable to obtain, after melting, fibers from samples of the material represented by plaintiff's exhibits 3, 4, 5, and 6 (R. 248–252). Dr. Chap testified, however, that, after melting a sample of the imported merchandise (defendant's exhibit J), the material melted to a viscous liquid, from which he was able to pull out the material in long fibers or filaments (R. 258).

The Government's final witness was Dr. Marion C. Reed, who holds the degree of doctor of philosophy in organic chemistry and who stated that he is a member of a number of scientific and honorary societies. Dr. Reed testified that he had become familiar with polyethylenes through laboratory work, which he began about 1943 or 1944, when the material was first made in the United States, and that he was also familiar with waxes, including microcrystalline wax (R. 264–265). He testified that he had separated a portion of the imported merchandise (defendant's exhibit J) into fractions and "made certain tests on each of the fractions and on the composite before separation" (R. 266). He stated that he found that the microcrystalline wax fraction had no elasticity and practically no tensile strength, whereas the polyethylene fraction was elastic, very viscous, "and could be pulled out into fibers" (R. 269).

This witness further testified that the "original material before separation also melted to a very viscous liquid having the appearance of elasticity and could be formed into fibers at least a yard long" (R. 269). Concerning the use of polyethylene, the witness testified that that material is used for coating papers and stated, further, that he had also seen it used together with wax for coating papers.

In this case, there is a wide range of difference in the testimony presented by the plaintiff's witnesses and that adduced from the witnesses for the defendant. Basically, plaintiff's witnesses maintain

that all resins are substantially amorphous and lack any appreciable crystallinity and that polyethylene is never a resin, although it is more definitely a wax when it possesses a low molecular weight than when its molecular weight has been increased above five thousand. Defendant's witnesses, particularly Dr. Busse, testified that snythetic resins may be characterized by a high degree (approximately half) of crystallinity and are definitely not always amorphous; that the most accurate way to determine whether a substance is a wax or a resin is not by studying its formation for external appearance, but by submitting it to tests to determine its elasticity, melting point, viscosity, and capacity to be drawn into fibers.

Polyethylene is a comparatively new substance, not introduced into this country until around 1943. It was, therefore, not known in the United States at the time the Tariff Act of 1930 was enacted. Synthetic resins, however, were then in general use and are expressly provided for under paragraph 11 of the act. Of course, waxes were known and used long before there was any tariff legislation. The term "polyethylene" is not found in the older dictionaries. However, in Webster's New Collegiate Dictionary, 1953, at page 654, the term is defined as follows:

**polyethylene,** *n.* *Chem.* A polymer of ethylene; specif., any of a group of light thermoplastic synthetic resins used for insulating, etc.

It is well settled, of course, as contended by counsel for the plaintiff in his brief, that tariff laws are not drafted in terms of science, but in the language of commerce, which is presumptively that in common use (*Hummel Chemical Co.* v. *United States*, 29 C. C. P. A. (Customs) 178, C. A. D. 189). In this connection, it is apparently the contention of the plaintiff that the proof adduced on behalf of the Government as to the molecular weight, viscosity, elasticity when melted, and film-forming characteristics of the imported product constitutes scientific or chemical proof, and that, since it is settled law that tariff acts are to be interpreted from a commerical standpoint and not in a scientific sense, such proof offered by the defendant carries no weight in the determination of the present issue. However, the tests made by defendant's witnesses disclose certain physical characteristics of the imported product, and, in our opinion, their testimony as to the results of these tests and their conclusion therefrom that the imported product possesses the characteristics of a resin is not predicated upon the scientific understanding of the term "resin," but is based upon the physical characteristics of the product at bar, as determined by analysis. Therefore, such testimony is pertinent in the determination of the question before us.

In support of its contention that the product at bar is a wax, counsel for the plaintiff in his brief directs our attention to the case of *P. Beiersdorf & Co., Inc.* v. *United States*, 31 C. C. P. A. (Customs)

158, C. A. D. 267. The merchandise there imported was classified as "an inedible animal grease or fatty acid derived from inedible grease, processed," under paragraph 37 of the Tariff Act of 1930. The importer claimed the merchandise was properly free of duty as "an animal wax, not specially provided for, under paragraph 1796 * * * or as a manufacture of wax, not specially provided for * * *." In that case, the court, after discussing the meaning of the term "wax," as commonly understood, held the product there imported properly dutiable as an animal wax, as claimed, the court finding from the evidence that the merchandise there involved possessed physical properties similar to beeswax, a comparable animal wax, such as melting point, specific gravity, saponification value, iodine value, and other physical properties determinable by analysis, and further found that the imported merchandise had the same uses as beeswax.

The facts in the *Beiersdorf* case, *supra*, however, are clearly distinguishable from the situation in the case at bar. Here, the physical characteristics of the imported product, as determined by analysis, show that its predominant qualities are those of a synthetic resin, the record further establishing that, in its condition as imported, the product at bar is not used as a wax but, in such condition, possesses those physical properties and uses which identify it with synthetic resins. Accordingly, the *Beiersdorf* case, *supra*, is not controlling of the issue here before us.

The case of *Adolphe Hurst & Co., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 96, C. A. D. 322, also cited by counsel for the plaintiff, is likewise distinguishable. There, the imported product had been classified as a manufacture of wax under paragraph 1536 of the Tariff Act of 1930 and was claimed properly free of duty under paragraph 1796 of the said act for "Wax: Animal, vegetable, or mineral, not specially provided for." Our appellate court therein held the involved product properly dutiable, as claimed, the import of the court's holding being that the provision for wax in paragraph 1796, *supra*, is not limited to natural products only and that the involved product, processed from montan wax, a mineral wax, was not precluded from free entry merely because it was not in its crude or natural state, the processing there involved having only fitted the Dura Wax in question "for uses to which the basic or starting material was not adapted." It accordingly appears that our appellate court in the above-cited case held the involved merchandise properly dutiable as a wax, upon a showing that the processing of the montan wax did not destroy the wax characteristics of the resultant product, but rather that it gave it additional waxlike properties, fitting it for use as a wax. In the case at bar, however, the mixing of the petroleum wax and the polyethylene fraction in the proportions indicated has resulted in a modification of the petroleum wax fraction, resulting in a product which, in its condi-

tion as imported, exhibited the qualities characteristic of a synthetic resin.

In our opinion, the record establishes that the polyethylene fraction of the imported product is a synthetic resin. In this connection, the uncontradicted testimony adduced on behalf of the defendant is that the molecular weight of the polyethylene component is "15,000," i. e., in terms of the weight of hydrogen atoms, "15,000 times as much as a hydrogen atom" (R. 165). Plaintiff's witness, Dr. Mantell, admitted, on cross-examination, that "the upper molecular weight" of a polyethylene wax is "of the order of five thousand" (R. 122).

Plaintiff, in its brief, directs our attention to the cases of C. R. Bard, Inc., et al. v. United States, 72 Treas. Dec. 380, T. D. 49189, and C. R. Bard, Inc. v. United States, 2 Cust. Ct. 244, C. D. 134, as authority for the proposition that, even though polyethylene be considered to be a synthetic resin, nevertheless, the mixture of the polyethylene component with a mineral wax takes it out of the provisions of paragraph 11, here involved, for "synthetic resins." The holdings in those cases, however, are not controlling in the determination of the present issue.

In the first Bard case, supra (T. D. 49189), the court, in its decision, held in effect that, even though the involved merchandise was in chief value of synthetic gum (also within the provisions of paragraph 11 of the Tariff Act of 1930, here in question), the provisions of paragraph 11, supra, do not cover "articles" made of synthetic gums but only synthetic gums per se. The merchandise there in question was "completely manufactured articles in their finished forms ready for immediate use for specific purposes, without being further processed in any particular." In the second Bard case, supra (C. D. 134), there were also involved articles which were completely manufactured and which were ready for immediate use for specific purposes, without being further processed. The court therein followed its holding in the first Bard case, supra, holding the pertinent merchandise dutiable under paragraph 1558 of the Tariff Act of 1930 as "articles," manufactured in whole or in part, not specially provided for. The merchandise in the case at bar, however, unlike that involved in the Bard cases, supra, is not a completely finished "article" ready for immediate specific use, without further processing, but is a mixture of a synthetic resin and a wax, which, in its condition as imported, is used as a material in the ultimate production of a wax.

The testimony in this case establishes that not only does the polyethylene fraction (defendant's exhibit C) in the imported product possess the characteristic of being elastic when melted, but that it is also susceptible of being drawn into fibers (R. 269). The record further establishes that these well-recognized characteristics of a resin, as testified to by three well-qualified witnesses for the defendant,

are also to be found in the entire product, as imported (defendant's collective illustrative exhibit H) (R. 284). The testimony of defendant's witnesses in this respect was not refuted by any evidence adduced on the part of the plaintiff.

The product at bar, in its condition as imported, is not used for the purposes for which a "wax" is used—but is a mere "material," which, after importation, is mixed with microcrystalline wax in the proportion of 6 parts of the imported material and 94 parts of microcrystalline wax. The resulting mixture is then combined with paraffin wax in the ratio of 50 parts of the latter mixture and 50 parts of paraffin wax. It is this final mixture which is employed for the purpose for which a wax is used, in this case to coat sulfite paper for wrapping bread (R. 4). It appears, as testified to by the witnesses for the defendant, that the merchandise, in its condition as imported, is used as a modifier for wax for the purpose of imparting to the end product certain characteristics indentifiable with synthetic resins (R. 169, 185, 190, 191), the record establishing that polyethylene is employed to change the properties of a wax by modifying it so as to give it the quality of toughness for its end use.

The testimony of the plaintiff's witnesses to the effect that the imported product possesses some of the physical characteristics of a wax is insufficient to establish that the use of the merchandise, in its condition as imported, is as a wax. While it may be true, as indicated by the testimony of plaintiff's witnesses, that the imported commodity possesses some of the physical characteristics of a wax, the record establishes that the physical mixture of polyethylene and petroleum wax, as appears in this case, does not destroy the synthetic resin characteristics of the product, in its condition as imported, and, in our opinion, the predominant characteristics of the mixture at bar are those possessed by synthetic resins, namely, softening over a broad temperature range; viscous when melted (R. 169, 186, 258); elasticity when melted (R. 169, 186, 189, 261); and capacity of the melt to be drawn into fibers (R. 169, 186, 195, 261).

It appears to us significant that the product at bar in its condition, as imported, can be and was separated into its components and, in this connection, the record establishes that such separation was a "very simple" process (R. 299). In our opinion, this factor supports the conclusion that the mixture in question was imported for the purpose of utilizing the material for its resinlike qualities, the record further establishing that, as imported, the merchandise in question possesses the characteristic qualities of a synthetic resin.

We deem it pertinent at this point to discuss the alternative claims made by the plaintiff. Among such is a claim that the imported merchandise is properly dutiable as paraffin under the provisions of paragraph 1733 of the Tariff Act of 1930 for "* * * all distillates

obtained from petroleum, including * * * paraffin, * * * not specially provided for." In this connection, counsel for the plaintiff, in his brief, contends that both microcrystalline wax and polyethylene are obtained from petroleum by distillation processes. The record establishes, however, that polyethylene is produced by the polymerization of liquid ethylene at high temperatures and that ethylene itself is produced or derived from the cracking of petroleum oil (R. 22, 136). Polymerization is a chemical reaction in which two or more molecules of the same substance combine to form a compound (Hackh's Chemical Dictionary, 3d edition, 1944, page 672). A product of polymerization, therefore, such as the polyethylene fraction in the imported product, is not a distillate obtained from petroleum. Further, the mixture here under consideration, in the condition in which imported, is not used for the purposes for which paraffin itself is used. (See Hackh's Chemical Dictionary, *supra*, page 615.) Plaintiff's claim that the imported product is classifiable under paragraph 1733 of the Tariff Act of 1930 as a distillate obtained from petroleum, such as paraffin, is overruled.

The imported product is not a manufacture of wax (paragraph 1536 of the Tariff Act of 1930), as is also alternatively claimed by the plaintiff. To constitute a manufacture of a thing, it must appear that something has been produced so changed or advanced in condition from what it was before being subjected to the processing or treatment that it has attained a distinct name, character, or use different from that originally possessed by the material before being subjected to the manufacturing process. *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C. C. P. A. (Customs) 60, T. D. 47051. The merchandise at bar, in its condition as imported, is not a finished article dedicated to a specific use or class of uses with a distinct name, but is a mixture of two components, which mixture does not result in a new article having uses different from either of the components in the mixture. The importation in question is still a material which is further processed and which, in its condition as imported, has the dominant characteristics of a synthetic resin. Accordingly, plaintiff's claim for classification of the imported product as a manufacture of wax is overruled.

Plaintiff also claims alternatively that the imported product is properly classifiable under paragraph 5 of the Tariff Act of 1930 as a mixture of chemical compounds, not specially provided for. However, in view of our holding that the merchandise at bar, possessing as it does the dominant characteristics and use of a synthetic resin, is classifiable under the provisions of paragraph 11 of the Tariff Act of 1930 as a synthetic resin, and that it is, accordingly, specially provided for as such, plaintiff's alternative claim that the imported merchandise

should be held dutiable as a mixture of chemical compounds is over-ruled.

Plaintiff further claims alternatively that the imported merchandise is properly classifiable under paragraph 1558 of the Tariff Act of 1930 at the rate of 20 per centum ad valorem as a nonenumerated manu-factured article, not specially provided for. In this connection, this court, with respect to the rules of classification, has enunciated the principle that we cannot resort to the catchall clause in paragraph 1558 of the Tariff Act of 1930 until the "mixed materials" clause in paragraph 1559 of the said act is found inapplicable. See *Oviatt Importing Co.* v. *United States*, 8 Cust. Ct. 276, C. D. 620.

In the *Oviatt Importing Co.* case, *supra*, the merchandise consisted of champagne wine, cognac, curacao liquor, bitters, and sugar. It was classified under the provisions for "champagne" in paragraph 803 of the Tariff Act of 1930 and claimed dutiable under paragraph 1558 of the said act as a nonenumerated manufactured article. The court found that champagne was the component material of chief value of the imported merchandise and, in overruling the claim of the plaintiff, stated:

We are of opinion that the mixed-materials clause in paragraph 1559 bars classification of the merchandise under paragraph 1558 in any event, and, in view of the further fact that the plaintiff failed to prove that the orange champagne cocktail was not champagne or other sparkling wine, either commonly or commercially, we hold that the presumption of correctness attaching to the collector's classification has not been overcome. The claim under paragraph 1558 is overruled.

The pertinent portion of paragraph 1559 of the Tariff Act of 1930 provides—

* * * and on articles not enumerated, manufactured of two or more materials, the duty shall be assessed at the highest rate at which the same would be chargeable if composed wholly of the component material thereof of chief value; * * *.

The record in this case establishes that the polyethylene component in the imported product is a synthetic resin. Assuming, for the pur-pose of considering plaintiff's claim under paragraph 1558, *supra*, that the imported product is an article manufactured from two distinct entities dutiable under the tariff act, viz, one, polyethylene—a synthetic resin—and the other, petroleum wax—a mineral wax—then, under the provisions of paragraph 1559, *supra*, the merchandise must be held dutiable at the rate applicable to the component material of chief value. Plaintiff, however, has introduced no evidence tending to establish the component material of chief value of the imported merchandise. Accordingly, the plaintiff has not met the burden imposed upon it of establishing that the classification made by the collector is erroneous and of affirmatively establishing that its own

claim under paragraph 1558 is correct. Such failure of proof precludes consideration by the court of the provisions of paragraph 1558, *supra*, with respect to the merchandise at bar, inasmuch as it must be established that the said merchandise is not subject to the provisions of paragraph 1559, *supra*, before it can be held classifiable as a non-enumerated manufactured article.

The collector's classification and assessment are presumed to be correct until overthrown by proof and that burden is upon the importer. *United States* v. *Marshall Field & Co.*, 18 C. C. P. A. (Customs) 469, T. D. 44761; *United States* v. *I. Magnin & Co., Inc.*, 21 C. C. P. A. (Customs) 77, T. D. 46394. Further, the importer must establish not only that the assessment of duty by the collector is wrong, but that the importer's claim is correct. *Benrus Watch Co. and Pomerance Co. (Inc.)* v. *United States*, 21 C. C. P. A. (Customs) 139, T. D. 46467; *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C. C. P. A. (Customs) 150, C. A. D. 227.

We are of opinion that the testimony in this case, taken as a whole, indicates a failure on plaintiff's part to overcome the presumption of correctness attaching to the collector's classification and that the record supports the collector's classification of the imported product under paragraph 11 of the Tariff Act of 1930 as a synthetic resin, not specially provided for. The protest is, therefore, overruled and judgment will be entered accordingly.