(C. D. 1887)

C. J. Tower & Sons *v.* United States

United States Customs Court, First Division

(Decided June 11, 1957)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill* and *Murray Sklaroff*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar consists of certain products, invoiced as "Melmac 247–10," "Beetle 230–8," and "Rezyl 412–1," which were classified at the rate of 40 cents per pound and 25 per centum ad valorem under paragraph 24 of the Tariff Act of 1930 as alcoholic compounds, not specially provided for, containing more than 20 per centum and not more than 50 per centum of alcohol. Plaintiff herein disputes neither the finding of the presence of alcohol nor the amount, but claims the products here in question are properly classifiable at the rate of 4 cents per pound and 30 per centum ad valorem under paragraph 11 of the said act as synthetic resins, not specially provided for. The record discloses that the importations in question were purchased from the Canadian Division of the American Cyanamid Co. (R. 8).

Defendant offered five exhibits in evidence. Exhibit A consists of a technical data sheet concerning "Melmac 247–10" under the heading, "An Unmodified Melamine-Formaldehyde Resin," issued by the American Cyanamid Co., which states in part as follows:

Melmac 247–10 is a new development in amino resins. It has excellent compatibility with medium oil strength varnishes and mineral spirit solutions of alkyd resins. These combinations are used in economical baking finishes for many industrial purposes.

Melmac 247–10 imparts improved stability to baking finishes based on alkyd-amino resin combinations. These enamels bake in normal schedules to hard mar-proof finishes with improved alkali resistance. With standard application techniques these finishes have excellent and uniform flow, and high gloss.

The said exhibit also discloses that the product contains butanol.

Exhibit B consists of a technical data sheet, also issued by the American Cyanamid Co., reading in part:

BEETLE 230–8 is a combination urea-melamine-formaldehyde resin designed to incorporate the qualities of melamine resins with the economy of urea resins. It is used with REZYL resins to produce fast-baking finishes * * *.

This information sheet discloses that the product in question contains butanol and xylol.

With respect to the aforesaid exhibits A and B, plaintiff's only witness in the case agreed that, in the production of the goods his company manufactures, reliance is placed upon the statements contained therein as to the chemical composition of the products described and the use that may be made of them.

Defendant's exhibit C consists of a laboratory report of the product covered by entry No. 1507 in protest 282339–K, invoiced as "Melmac 247–10 (CODE 318 GUM)." The report indicates that the commodity

consists of "a solution of melamine-formaldehyde condensation product (approximately 66%) in butyl alcohol (approximately 34%)" and that it "has the characteristics of a synthetic resin."

Exhibit D consists of a laboratory report of merchandise covered by entry No. 5105 in protest 282339–K, which indicates that the product is similar to that covered by exhibit C, except that the butyl alcohol content is approximately 40 per centum by weight.

The remaining exhibit (E) consists of a laboratory report of merchandise included in entry No. 3217 in protest 282340–K, which shows that the product, designated as "Beetle 230–8," is a solution of a urea-formaldehyde condensation product in a mixed butyl alcohol-xylene solvent and that the butyl alcohol content is 30 per centum by weight.

Plaintiff called one witness, Mr. William H. Lutz, technical director for 20 years and vice president for 2 years with Pratt & Lambert, Inc., of Buffalo, N. Y. (the ultimate consignee), manufacturer of paint, varnish, lacquer, and related products, including some synthetic resins. The witness was a graduate of Rensselaer Polytechnic Institute, with the degree of chemical engineer. He testified that he had seen various synthetic resins produced and that he had become familiar with the properties of synthetic resins. He gained this knowledge by being in charge of the firm laboratory which "acts as a controlling medium," supervising the quality of the products made by it. The witness stated that he had a general knowledge of the composition of the imported products and that his company, over a period of years, had bought great quantities of such commodities under the designations "Melmac" 247–10, "Beetle" 230–8, and "Rezyl" 412–1 (R. 7).

Testifying from personal knowledge, Mr. Lutz further stated that the "Melmac" 247–10 and the "Rezyl" 412–1 were used, at the time of importation, in high-bake adhesive varnishes, which were sold to a manufacturer of abrasive papers, after combining these resins with other raw materials at the factory; that the "Beetle" 230–8 was combined with pigment and other raw materials to produce baking white enamels, which are sold to manufacturers of fluorescent lighting fixtures. He defined the term "synthetic resin" as follows:

The synthetic resin is a man made amorphous organic substance having many of the properties of natural resin such as rosin. The synthetic resins are for the most part non-conducting from an electrical point of view. When hard and brittle they fracture with the conchoidal fracture. They are soluble in certain specific solvents. And they are dissimilar in chemical composition from the natural resins which they resemble in physical properties. (R. 9.)

and stated that the three importations at bar come within the given description.

The witness further testified that there are very few alcoholic compounds which, in his opinion, are resins, citing shellac varnish or spirit varnish, a solution of shellac resin in alcohol, as the only example of such resins coming to his mind. He stated, however, that

there are many synthetic resins that contain alcohol in their preparation. Further distinguishing synthetic resins and alcoholic compounds, plaintiff's witness testified that all chemical elements, compounds, mixtures, preparations, salts, or combinations thereof, when containing alcohol or alcoholic compounds, are not synthetic resins, but that there are many such products which are not synthetic resins (R. 11).

On cross-examination, Mr. Lutz testified that a urea-formaldehyde resin is the condensation product of urea and formaldehyde, two chemical compounds; that the basic composition of the "Melmac" 247–10 commodity is the reaction product of the chemical compounds, melamine urea and formaldehyde; and that the "Rezyl" 412–1 (409 gum) is the reaction product of an alcohol, such as glycerine, with an acid, such as phthalic acid or anhydride chemical compounds. He stated that the products "Melmac" 247–10 and "Beetle" 230–8, in their condition as imported, contain butyl alcohol and that, in the case of the "Beetle" 230–8 commodity, the solvent, in addition to the presence of a large percentage of butyl alcohol, consists also of xylene. The witness agreed that all of the involved products, in their condition as imported, are in a liquid form (R. 14), stating, in explanation, that by "liquid form" he meant that the resins are in solution, and the liquid form, therefore, makes them easier to transport and handle, and, further, that, in their condition as imported, the products at bar are compounds (R. 17). Mr. Lutz, describing the physical condition and appearance of the imported products, stated that they look like Karo corn sirup or molasses; that they are viscous, heavy-bodied, sticky materials, and have a characteristic solvent odor; that, when they get between the fingers, they have a sticky feeling like flypaper, which feature, the witness testified, was characteristic of most synthetic resin solutions.

It is contended, however, on behalf of the plaintiff, that the importations in question are also embraced within the provisions of paragraph 11 of the Tariff Act of 1930 for synthetic resins and that the question here for determination is one of relative specificity between the two paragraphs. In this connection, plaintiff's counsel (brief, page 6) states the issue as follows:

* * * The issue can therefore be stated as whether or not a synthetic resin which contains alcohol is more specifically provided for under the *eo nomine* designation for synthetic resins or under the broad provisions for alcoholic compounds which includes many other products which are not synthetic resins.

The defendant, in the case at bar, maintains that the involved products, being concededly chemical compounds containing alcohol, are embraced squarely within that portion of paragraph 24 of the Tariff Act of 1930, providing for "Chemical * * * compounds, preparations * * * when containing alcohol," and contends that there is no question of relative specificity here involved.

As disclosed by the record in this case, it would appear that there are few alcoholic compounds that are "resins." Plaintiff's witness, who, it appears, was familiar with the properties of synthetic resins, testified that, to the best of his knowledge, shellac varnish known as "spirit varnish," which he stated was an alcoholic solution of shellac resin, is the only example of such resins (R. 10–11). There are many elements, compounds, and preparations, when containing alcohol, that are not synthetic resins (R. 11–12). In the Summary of Tariff Information, 1929, relative to paragraph 24 of the act, at page 119, it is stated:

### Chemical Elements, Compounds, and Preparations Containing Alcohol

Description.—This paragraph includes a large variety of preparations containing alcohol, except perfumery and spirit varnishes, and all alcoholic compounds not specially provided for.

On the other hand, the testimony herein and literature on the subject, as hereinafter appears, discloses that there are many synthetic resins containing alcohol in their preparation.

In the Summaries of Tariff Information, 1948, volume 1, part 1, with reference to paragraph 11 of the Tariff Act of 1930, respecting "SYNTHETIC NON-COAL-TAR RESINS, EXCEPT VINYL RESINS" at page 178, the following is stated:

### Comment

This summary covers all synthetic non-coal-tar resins except those made in chief value from vinyl acetate and other vinyl derivatives, which are subject to a different rate of duty and are dealt with elsewhere (see separate summaries under par. 2). The resins covered here include certain alkyd resins, such as citric acid-alcohol and sebacic acid-alcohol resins; organic nitrogen resins, such as urea, thiourea, and melamine formaldehyde resins; allyl alcohol and silicone polymerization resins; polyacrylic acid ester resins; polyethylene resins; and certain petroleum resins. Most of the raw materials (ethylene, urea, various acids, and formaldehyde) necessary for the production of these resins are available in this country in large quantities. Cyanamid, the raw material for the melamine resins, is not produced in the United States; it is imported from Canada.

Synthetic non-coal-tar resins are used in the manufacture of protective coatings; for adhesives; for molding and casting; for the treatment of textiles, paper, and leather; and for several other miscellaneous uses.

\*        \*        \*        \*        \*        \*        \*

Page 179:

Prewar imports came principally from Germany with smaller quantities from the United Kingdom, Switzerland, and Canada (see table 2). These imports consisted principally of polyethylene, polyamide, and urea-formaldehyde resins. Postwar imports have come principally from Canada and Switzerland, and consisted largely of urea-formaldehyde resins. \* \* \*

\*        \*        \*        \*        \*        \*        \*

In report No. 131, second series, issued by the United States Tariff Commission, on "Synthetic Resins and Their Raw Materials," we find, at page 32:

### 5. Urea Resins

One of the most important series of thermosetting resins is the group made by condensing urea and formaldehyde. As early as 1897 it was discovered that an amorphous condensation product was obtained from the reaction of urea and formaldehyde. The clear glass-like mass obtained led to considerable research work toward the development of a substitute for glass. * * *

About 1929 the first successful straight urea product was perfected in the United States. * * *

An interesting fact concerning these resins is that they are produced indirectly from four gases: Ammonia, carbon dioxide, hydrogen, and carbon monoxide. Ammonia and carbon dioxide react to form urea, and hydrogen and carbon monoxide yield methyl alcohol which is converted to formaldehyde.

At page 33:

Another application of urea resins which has grown rapidly in the past 2 years is in combination with alkyd resins in surface coatings. * * * Until recently the use of urea resins in paints and varnishes was discouraged by their insolubility in organic solvents and their instability. * * * The development of methods for preparing condensates, which overcome the undesirable properties, has made available resins for this use. They are marketed as water-white viscous solutions in a mixture of organic solvents and are intended for use in baking finishes. They cannot be used alone because the cured resin is extremely hard and brittle and lacks adhesion. When combined with more elastic film-forming materials such as drying or nondrying oil alkyd resins, they produce coatings that are mar-proof, resistant to alcohol, grease, oil, and fruit acids, and available in a full range of colors. Applications are in metal furniture finishes, toys, refrigerators, can, and drum coatings.

As to the characteristics of the merchandise at bar, plaintiff's witness testified that the involved products, as do all synthetic resins, soften under heat and produce hard "films" when the solvent evaporates, leaving the film with resinlike physical characteristics (R. 10). The record further establishes that the products at bar, in their imported condition, are materials for further processing to produce various finishes after being combined with other raw materials. In our opinion, the imported products are similar to those involved in the case of *Industrial Raw Materials Corp.* v. *United States*, 36 Cust. Ct. 192, C. D. 1774.

In the case above cited, the court held that the involved commodity, which, in its condition as imported, was not used for purposes for which a wax was used, but which, in such condition, was employed merely as a material for further processing in the ultimate production of a wax and which exhibited the characteristic qualities of a synthetic resin, was properly classifiable under paragraph 11 of the Tariff Act of 1930 as a synthetic resin, not specially provided for, as classified, rather than free of duty under paragraph 1796 of the said act as a mineral wax, as claimed.

While it is true that, in the *Industrial Raw Materials Corp.* case, *supra*, the provisions for alcoholic compounds in paragraph 24 of the tariff act were not involved, yet, the products here imported, while

embraced within the provisions for alcoholic compounds in the pertinent act, are, in our opinion, also classifiable under the provisions in paragraph 11 of the act for synthetic resins, since they exhibit the characteristics of synthetic resins and are employed as such in their ultimate use. In our opinion, the provision for synthetic resins in paragraph 11 of the tariff act herein more adequately describes the imported products than does the provision in paragraph 24 of said act, covering alcoholic compounds, and we hold that the imported merchandise is more specifically provided for in the paragraph of the tariff act under which the importer herein claims it properly dutiable, than under the provision of the act under which it was classified.

The provisions for "Chemical elements, and chemical * * * compounds, preparations, mixtures, and salts," when containing alcohol, in paragraph 24 of the Tariff Act of 1930 is more specific than the general provision for "alcoholic compounds," not specially provided for, in the same paragraph. See, to this effect, *Chattanooga Brewing Co. et al.* v. *United States*, 26 Treas. Dec. 127, T. D. 34124. In our opinion, the provision in paragraph 11 of the act for "synthetic * * * resins," not specially provided for, is likewise more specific than the provisions in paragraph 24 for chemical compounds, when containing alcohol, or for "alcoholic compounds," not specially provided for, since it appears there are many chemical compounds containing alcohol and alcoholic compounds which are not synthetic resins, and we are of opinion that the *eo nomine* provision for "synthetic * * * resins," not specially provided for (paragraph 11), is more applicable to the imported products—even though they are chemical compounds or alcoholic compounds—than the provisions for chemical compounds, when containing alcohol, or for alcoholic compounds, not specially provided for (paragraph 24).

Certain paragraphs of the tariff act, which provide *eo nomine* for certain products, contain, in addition, a "proviso" or language regarding the presence of alcohol in the products dutiable thereunder, which provides, in effect, that if the products contain alcohol they shall not be dutiable under said paragraphs. (See paragraphs 10, 13, 34, 37, 38, 39, 57, 60, and 75.) Many synthetic resins contain alcohol in their preparation (R. 10) (and Summaries of Tariff Information, 1948, volume 1, part 1, page 178), *supra*. It would appear that if Congress intended that "synthetic resins," *eo nomine* provided for in paragraph 11 of the tariff act, when containing alcohol, were not to be included in said paragraph 11, it would have incorporated in the paragraph a "proviso" to the effect that, if the synthetic resins contain alcohol, they shall not be dutiable thereunder, similar to the provisos contained in the aforesaid paragraphs.

On the record presented in this case and for the reasons stated aforesaid, we hold that the products here under consideration are

properly dutiable at the rate of 4 cents per pound and 30 per centum ad valorem under paragraph 11 of the Tariff Act of 1930 under the provision therein for synthetic resins, not specially provided for, as claimed. The protests herein are sustained. Judgment will be entered accordingly.